# No. 20-15946

### IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### IGNACIO PEREZ, on behalf of himself and all others similarly situated,
*Plaintiff-Appellee,*

*v.*

### RASH CURTIS & ASSOCIATES,
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA
YVONNE GONZALEZ ROGERS, DISTRICT JUDGE • CASE NO. 4:16-CV-03396-YGR

---

## APPELLANT'S OPENING BRIEF

---

**HORVITZ & LEVY LLP**
ROBERT H. WRIGHT
FELIX SHAFIR
REBECCA G. POWELL
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**ELLIS LAW GROUP, LLP**
MARK E. ELLIS
ANTHONY J. VALENTI
LAWRENCE K. IGLESIAS
1425 RIVER PARK DRIVE, SUITE 400
SACRAMENTO, CALIFORNIA 95815
(916) 283-8820

ATTORNEYS FOR DEFENDANT-APPELLANT
**RASH CURTIS & ASSOCIATES**

## DISCLOSURE STATEMENT

K.B.R. Inc., dba Rash Curtis & Associates, has no parent corporation and no publicly traded company owns ten percent or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 3

STATEMENT OF ISSUES PRESENTED ................................................ 4

STATEMENT OF THE CASE ................................................................. 6

I.     Rash Curtis uses dialing technology to reach medical debtors. ..................................................................................... 6

II.    Plaintiff brings this class action against Rash Curtis. .................. 8

III.   The parties agree to settle, but Plaintiff reneges on the agreement while it is being formalized............................................. 9

IV.   The district court certifies the class, requiring as a prerequisite for membership a call to a skip-traced phone number, with Plaintiff as the sole class representative................ 11

V.    The district court grants Plaintiff partial summary judgment, ruling that Rash Curtis's dialing systems were ATDS's and Plaintiff did not consent to be called. ........................ 12

VI.   Plaintiff attempts to prove that Rash Curtis called skip-traced phone numbers through the opinions of three experts. ...... 13

VII.  The district court refuses to consider a motion to decertify, even when it becomes clear that Plaintiff cannot demonstrate every class member's phone number, including his own, was skip-traced. ............................................................ 15

VIII. After trial, the jury returns a verdict in favor of Plaintiff and the class. ......................................................................... 16

IX.   The district court denies Rash Curtis's motion to amend the judgment to reduce the unconstitutionally excessive damages award and grants Plaintiff's motion for an award of attorney fees from a common fund. ............................... 17

SUMMARY OF ARGUMENT ................................. 18

ARGUMENT ......................................................... 23

I.   Judgment for the class should be reversed because the district court abused its discretion by determining class membership based on an unreliable methodology that failed to follow the governing class definition. ....................... 23

    A.   The district court's "gatekeeper" responsibility under *Daubert* required it to make an explicit finding that Plaintiff's experts' methodology for determining class membership was reliable. .................................... 23

    B.   The district court failed to make an explicit finding regarding the reliability of Plaintiff's experts' methodology. ....................................................... 25

    C.   The district court's admission of unreliable expert testimony was not harmless, because the methodology was based on the unsupported assumption that each number in fields 5-10 was skip-traced................................. 26

II.   Judgment for the class must be reversed because the district court erred in refusing to decertify the class since Plaintiff is not a member of the class and thus not a proper class representative. .............................................................. 32

    A.   The district court had a continuing duty to ensure that the requirements of Federal Rule of Civil Procedure 23 were met throughout the litigation. ..................................... 32

    B.   It is reversible error to refuse to decertify a class where the class representative is not a member of the class.......... 32

C. The district court erred in granting class certification and later refusing to decertify the class because Plaintiff's phone number was not skip-traced and he is therefore not a member of the class he purportedly represents. ............................................................................. 38

D. At minimum, the district court erred by not instructing the jury to make the factual determination of whether Plaintiff's phone number was skip-traced. ........................... 44

III. Even if this Court does not reverse the judgment in its entirety, it should at minimum substantially reduce the award due to multiple errors affecting the amount of the judgment. ...................................................................................... 48

A. The district court abused its discretion in refusing to enforce the settlement agreement between the parties. ....... 48

B. The district court erred in not meaningfully applying the legal standard for reducing a judgment due to unconstitutionally excessive damages. ................................. 56

C. The judgment should be reduced by the damages attributable to calls made by Rash Curtis from 2015 through the entry of judgment because the TCPA's autodialer ban was unconstitutional during that period and courts do not have jurisdiction to enforce unconstitutional statutes. ..................................................... 64

D. The judgment should be reduced by the damages attributable to the 31,064 calls the jury found were not made with an "artificial or prerecorded voice," because the district court erred in ruling that Rash Curtis's dialing systems were ATDS's. ................................................ 67

E. The district court erred in awarding attorney fees to class counsel out of a common fund, thus risking the shifting of fees to Rash Curtis. ............................................ 69

CONCLUSION ........................................................................ 72

STATEMENT OF RELATED CASES ................................................. 73

CERTIFICATE OF COMPLIANCE ..................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alea London Ltd. v. Am. Home Servs., Inc.*
638 F.3d 768 (11th Cir. 2011) ............................................................ 57

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ............................................................. 32

*Barr v. Am. Ass'n of Political Consultants*,
140 S. Ct. 2335 (2020) ................................................. 3, 22, 64, 65, 66

*Botefur v. City of Eagle Point, Or.,*
7 F.3d 152 (9th Cir. 1993) ................................................................ 49

*Callie v. Near,*
829 F.2d 888 (9th Cir. 1987) .................................................. 49, 53, 54

*Capitol Records, Inc. v. Thomas-Rasset,*
692 F.3d 899 (9th Cir. 2012) ....................................................... 57, 60

*Christian Legal Soc. Chapter of the Univ. of Calif., Hastings*
*College of the Law v. Martinez,*
561 U.S. 661 (2010) ....................................................................... 55

*City of Pomona v. SQM N. Am. Corp.,*
750 F.3d 1036 (9th Cir. 2014) .......................................................... 27

*Clausen v. M/V NEW CARISSA,*
339 F.3d 1049 (9th Cir. 2003) .......................................................... 28

*Cmty. House, Inc. v. City of Boise,*
623 F.3d 945 (9th Cir. 2010) ............................................................ 65

*Creasy v. Charter Commc'ns, Inc.,*
No. 20-1199, 2020 WL 5761117 (E.D. La. Sept. 28, 2020) ........... 64, 65

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993) ................................................................ *passim*

*Davidson v. O'Reilly Auto Enters., LLC,*
   968 F.3d 955 (9th Cir. 2020) ............................................................ 43

*Duguid v. Facebook, Inc.,*
   926 F.3d 1146 (9th Cir. 2019), *cert. granted*, No. 19-511,
   2020 WL 3865252 (July 9, 2020) ...................................................... 66

*East Texas Motor Freight System Inc. v. Rodriguez,*
   431 U.S. 395 (1977) .............................................................. 33, 34, 38

*Estate of Barabin v. AstenJohnson, Inc.,*
   740 F.3d 457 (9th Cir. 2014) ................................................. 26, 27, 31

*Facebook, Inc. v. Duguid,*
   No. 19-511, 2020 WL 3865252 (July 9, 2020) .............................. 66, 68

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,*
   670 F. Supp. 1133 (E.D.N.Y. 1987) .................................................. 58

*Foster v. Ctr. Twp. of LaPort Cty.,*
   798 F.2d 237 (7th Cir. 1986) ............................................................ 37

*Gauss v. GAF Corp.,*
   103 Cal. App. 4th 1110 (2002) ......................................................... 53

*General Telephone Co. of Southwest v. Falcon,*
   457 U.S. 147 (1982) .................................................................. *passim*

*Golan v. FreeEats.com, Inc.,*
   930 F.3d 950 (8th Cir. 2019) ...................................................... *passim*

*Golan v. Veritas Ent., LLC,*
   No. 4:14CV00069, 2017 WL 3923162 (E.D. Mo. Sept. 7,
   2017) ................................................................................................ 58

*Harrop v. W. Airlines, Inc.,*
   550 F.2d 1143 (9th Cir. 1977) .......................................................... 49

*Hibbs v. Winn,*
   542 U.S. 88 (2004) ........................................................................... 67

vi

*Holtzman v. Turza,*
828 F.3d 606 (7th Cir. 2016) ........................................................ 70, 71

*In re Late Fee & Over-Limit Fee Litig.,*
741 F.3d 1022 (9th Cir. 2014) ............................................................ 58

*Ira Holtzman, C.P.A. v. Turza,*
728 F.3d 682 (7th Cir. 2013) ........................................................ 69, 70

*Kaufman & Broad-South Bay v. Unisys Corp.,*
822 F. Supp. 1468 (N.D. Cal. 1993) .................................................. 51

*Johnson v. California*
543 U.S. 499 (2005) .......................................................................... 32

*Legg v. Voice Media Grp., Inc.,*
No. 13-62044, 2014 WL 1767097 (S.D. Fla. May 2, 2014) ................ 30

*Legge v. Nextel Commc'ns, Inc.,*
No. CV 02-8676, 2004 WL 5235587 (C.D. Cal. Jun. 25,
2004) .................................................................................................. 58

*Levitz v. The Warlocks,*
148 Cal. App. 4th 531 (2007) ............................................................ 49

*Lewis v. Liberty Mut. Ins. Co.,*
953 F.3d 1160 (9th Cir. 2020) ........................................................... 60

*Lierboe v. State Farm Mut. Auto. Ins. Co.,*
73 P.3d 800 (Mont. 2003) ............................................................ 37, 38

*Lierboe v. State Farm Mutual Automobile Insurance Co.,*
350 F.3d 1018 (9th Cir. 2003) ................................................ 36, 37, 48

*Lindenbaum v. Realgy, LLC,*
No. 19-CV-2862, 2020 WL 6361915 (N.D. Ohio Oct. 29,
2020) .................................................................................................. 65

*Marbled Murrelet v. Babbitt,*
83 F.3d 1060 (9th Cir. 1996) ............................................................. 66

*Marks v. Crunch San Diego, LLC,*
  904 F.3d 1041 (9th Cir. 2018) ............................................................ 68

*Maryland v. Universal Elections, Inc.,*
  862 F. Supp. 2d 457 (D. Md. 2012) .................................................... 64

*Mateyko v. Felix,*
  924 F.2d 824 (9th Cir. 1991) ....................................................... 45, 48

*McCovey v. Pac. Lumber Co.,*
  No. C-91-1411-DLJ, 1992 WL 228888 (N.D. Cal. May 29,
  1992) .................................................................................................. 49

*McGlinchy v. Shell Chem. Co.,*
  845 F.2d 802 (9th Cir. 1988) ............................................................. 30

*Moreno v. City of Sacramento,*
  534 F.3d 1106 (9th Cir. 2008) ........................................................... 44

*MTB Enterprises, Inc. v. ADC Venture 2011-2, LLC,*
  780 F.3d 1256 (9th Cir. 2015) ........................................................... 65

*Parker v. Time Warner Ent. Co.,*
  331 F.3d 13 (2d Cir. 2003) ................................................................ 57

*Perez v. Indian Harbor Ins. Co.,*
  No. 4:19-cv-07288, 2020 WL 2322996 (N.D. Cal. May 11,
  2020) .................................................................................................. 59

*Perez-Farias v. Global Horizons, Inc.,*
  499 F. App'x 735 (9th Cir. 2012) .................................................. 57, 60

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .......................................................................... 43

*Primiano v. Cook,*
  598 F.3d 558 (9th Cir. 2010) ............................................................. 24

*Ramirez v. TransUnion LLC,*
  951 F.3d 1008 (9th Cir. 2020) ........................................................... 63

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009)............................................................ 43

*Rubio v. Capital One Bank*,
  613 F.3d 1195 (9th Cir. 2010) ......................................................... 54

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) ..................................................................... 65

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ......................................................... 69

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919) ............................................... 56, 57, 59, 60, 61, 62

*Stastny v. S. Bell Tel. & Tel. Co.*,
  628 F.2d 267 (4th Cir. 1980) ........................................................... 44

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ......................................................................... 57

*Texas v. Am. Blastfax, Inc.*,
  164 F. Supp. 2d 892 (W.D. Tex. 2001) ............................................ 64

*Thompson v. Frank*,
  599 F.3d 1088 (9th Cir. 2010) ......................................................... 66

*United States v. Bacon*
  No. 18-50120, 2020 WL 6498258 (9th Cir., Nov. 5, 2020) ........... 26, 31

*United States v. Ruvalcaba-Garcia*,
  923 F.3d 1183 (9th Cir. 2019) ....................................... 24, 25, 26, 27

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ......................................................... 69

*Wakefield v. ViSalus, Inc.*,
  No. 3:15-cv-01857, 2019 WL 2578082 (D. Or. June 24,
  2019)................................................................................................. 62

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................... 33, 45

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ................................................................ 31

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ..................................... 24, 27

## Statutes

28 U.S.C.
    § 1291 ........................................................................................ 3
    § 1331 ........................................................................................ 4
    § 1367 ........................................................................................ 4

47 U.S.C.
    § 227 .......................................................................................... 1
    § 227(a)(1) .............................................................................. 67
    § 227(b)(1)(A) ............................................................ 1, 25, 69

California Civil Code § 1542 ................................. 10, 50, 51, 52

California Code of Civil Procedure § 664.6 ................. 50, 53, 54

## Rules

Fed. R. App. P. 4(a)(1)(A) .......................................................... 4

Fed. R. Civ. P. 13(a)(1) .............................................................. 51

Fed. R. Civ. P. 23 .......................................................... *passim*

Fed. R. Civ. P. 23(a) ........................................................... 36, 44

Fed. R. Civ. P. 23(c)(1)(C) ........................................................ 43

Fed. R. Evid. 702 ........................................................... 23, 26, 27

## Miscellaneous

1 William B. Rubenstein et al., Newberg on Class Actions
    § 3:28 (5th ed. 2011) ............................................................ 33

# APPELLANT'S OPENING BRIEF

## INTRODUCTION

This appeal challenges a judgment exceeding $267 million in a class action against Rash Curtis & Associates under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. In relevant part, the TCPA makes it unlawful to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." § 227(b)(1)(A).

As a debt collection company, Rash Curtis used dialing technology from third-party vendors to reach medical debtors to settle their accounts with health care providers. At Plaintiff Ignacio Perez's request, the court certified four subclasses consisting of class members who were called at skip-traced phone numbers—i.e., numbers obtained by researching public and private databases.

In certifying and later refusing to decertify the class, the district court abdicated its gatekeeping role to exclude unreliable expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). It allowed Plaintiff's experts to use an unreliable

methodology to create an overbroad class list, which included owners of phone numbers that were skip-traced as well as an indeterminable number of people whose numbers were *not* skip-traced. Further, the court failed to ensure that the requirements of Federal Rule of Civil Procedure 23 were met when it allowed Plaintiff to represent the class even though his number was not skip-traced. Although Plaintiff was the only class representative at trial, his own experts admitted he was not a member of the class.

The district court made several additional errors that, at minimum, require remand for a substantial reduction of the damages award. The district court abused its discretion by refusing to enforce a settlement agreement between the parties that had been completed, but not reduced to writing, when Plaintiff reneged. After trial, the court abused its discretion when it failed to correctly apply the controlling legal standard for determining whether the judgment was unconstitutionally excessive.

Additionally, after judgment was entered, the United States Supreme Court held that a content-based exception to the TCPA for calls made to collect government debts—which existed between 2015

2

and July 6, 2020, when the Court severed the provision from the statute—was unconstitutional. *Barr v. Am. Ass'n of Political Consultants* (*AAPC*), 140 S. Ct. 2335, 2356 (2020). Thus, neither the district court nor this Court have jurisdiction to enforce the TCPA against Rash Curtis during the time when the TCPA was unconstitutional because it included the government debt exception, and the judgment should, at minimum, be reduced to ensure it does not encompass calls made during that time.

Furthermore, the court erroneously ruled that Rash Curtis's dialing systems violated the TCPA even though they do not fit the statutory definition of an "automatic telephone dialing system" ("ATDS"). Finally, the court erroneously awarded class counsel attorney fees equaling one-third of the judgment, by treating it as a common fund, which threatens to shift attorney fees to Rash Curtis in violation of the TCPA.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291. The district court had subject-matter

jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

The district court entered judgment following a jury verdict on September 9, 2019. (13-ER-3174–76.) After posttrial motions, it entered an amended final judgment on May 4, 2020. (14-ER-3679–82.) Rash Curtis filed timely notices of appeal from both judgments on October 3, 2019, and May 15, 2020, respectively. 13-ER-3177; 14-ER-3683; *see* Fed. R. App. P. 4(a)(1)(A). Pursuant to a stipulation between the parties, this Court dismissed the first appeal. (ECF No. 6.)

## STATEMENT OF ISSUES PRESENTED

1.    Did the district court abuse its discretion in admitting expert testimony that used an unreliable methodology to create a class list of individuals whose phone numbers were purportedly skip-traced?

2.    Did the district court abuse its discretion in certifying and refusing to decertify the class where Plaintiff was not called at a skip-traced phone number, and was thus not a member of the class he purported to represent? Alternatively, did the district court err in refusing to put the question of whether Plaintiff's phone number was in fact skip-traced to the jury?

4

3.      Did the district court abuse its discretion in failing to enforce the parties' settlement agreement or by refusing to hold an evidentiary hearing on whether the settlement agreement was complete?

4.      Did the district court abuse its discretion in failing to apply the legal standard for constitutionally excessive damages and refusing to reduce a ruinous judgment of more than $267 million against a small business?

5.      Can Rash Curtis be held liable for calls made between 2015 and July 6, 2020, when the TCPA included an unconstitutional content-based restriction that was ultimately severed from the statute by the United States Supreme Court?

6.      Does dialing technology qualify as an ATDS where it cannot dial randomly or sequentially generated numbers?

7.      Did the district court err in creating a common fund for the class members from which it awarded a percentage-based attorney fee for class counsel?

## STATEMENT OF THE CASE

### I.  Rash Curtis uses dialing technology to reach medical debtors.

Rash Curtis offers debt collection services to health care providers, calling debtors to settle their outstanding account balances. It reaches these debtors with the aid of technology that dials phone numbers stored in Rash Curtis's database of contact information associated with debtors. (*See* 3-ER-487–90.) Rash Curtis uses three calling systems to automatically dial these stored numbers. (*See id.*) For two systems, a recording directs the person answering the phone to indicate whether the call has reached the debtor and then connects the call to a representative. (3-ER-470; *see* 12-ER-3101–02.) A third system does not use a recording. (*See* 12-ER-3102.)

Rash Curtis obtains debtor contact information in different ways. Generally, it receives phone numbers from its creditor-clients when accounts are referred for collection. (1-ER-35.) In other situations, such as when the phone number is not available from the creditor, Rash Curtis uses "skip tracing" to find debtor contact information. (*Id.*) Skip tracing is the process by which possible phone numbers, addresses, and

6

other information are developed by searching publicly available sources and private databases. (*Id.*)

Rash Curtis maintains a database of information for account debtors it seeks to reach. For each account, Rash Curtis's database includes ten phone fields. (13-ER-3151.) Phone numbers received from a creditor-client are stored in phone fields 1-4, with field 1 reserved for the debtor's "residential" or primary number. (12-ER-3094; 13-ER-3149, 3159, 3168.) Whenever Rash Curtis obtains a phone number through skip tracing, it places that number in fields 5-10. (12-ER-3094.)

Thus, all numbers that Rash Curtis has obtained via skip tracing are located in fields 5-10. However, Rash Curtis *also* places other, non-skip-traced phone numbers in those fields. (*See* 13-ER-3171–72.) For example, when a creditor-client sends more than four numbers for a particular debtor, the first four numbers will be in fields 1-4, and then the remainder will overflow into fields 5-10. (*Id.*) Thus, although it is true that all numbers Rash Curtis obtained through skip tracing were inputted into fields 5-10, the converse is not true—not all numbers in those fields were skip-traced. (*Id.*)

## II.   Plaintiff brings this class action against Rash Curtis.

In June 2016, three individuals (Sandra McMillion, Jessica Adekoya, and Perez) filed a class action complaint against Rash Curtis asserting that each class member had received calls on their cell phones without prior express consent in violation of the TCPA. (3-ER-565–69.)[1] McMillion and Adekoya settled their individual claims, leaving Perez the only plaintiff and class representative at trial. (9-ER-2259–61.)

Rash Curtis called Plaintiff at a phone number ending in 5193, with the call connecting and lasting more than six seconds on fourteen occasions. (12-ER-3097.) On each occasion, Rash Curtis sought to contact a medical debtor named Daniel Reynoso, whose number appears to have been reassigned to Plaintiff after Reynoso received treatment from one of Rash Curtis's clients, Sutter General Hospital. (*See* 1-ER-42.) Plaintiff told Rash Curtis's account representative to stop calling because it had the wrong number, and he was not Reynoso. (12-ER-3097, 3107.) After the last of these phone calls, the representative deleted this number from Rash Curtis's database, removing it from

---

[1]   The complaint also asserted other claims, but they were resolved in Rash Curtis's favor at summary judgment and are not at issue in this appeal. (1-ER-33–34.)

where it had been stored in field 1 (i.e., the residential number field).
(12-ER-3097, 13-ER-3158–59; *see* 13-ER-3149, 3159, 3168.)

## III. The parties agree to settle, but Plaintiff reneges on the agreement while it is being formalized.

Early in the litigation, counsel for the parties engaged in an email discussion regarding settlement. In December 2016, Plaintiff's counsel[2] made an offer of $60,000 to be paid through a payment plan. (*See* 2-ER-229.) After some back-and-forth, Plaintiff's counsel wrote on January 3, 2017: "Please confer with your client and let me know if we have a deal." (2-ER-223.) In a later, posttrial joint filing, Plaintiff admitted that this was a settlement offer and that he had given his counsel authority to make it. (14-ER-3504 ("On December 19, 2016, Perez's counsel made an offer in writing to settle the Lawsuit for $60,000.").) On January 13, 2017, Rash Curtis accepted the offer, with its counsel writing, "Ok, *we have a deal* on the [$60,000] with payments." (2-ER-235 (emphasis added).) Defense counsel stated he would prepare a

---

[2] At this time in the litigation, Plaintiff's counsel represented Perez as well as the two additional original plaintiffs. (*See* 2-ER-201–02.)

written version of the agreement, which he sent approximately two weeks later. (2-ER-235–37.)

Several days later, Plaintiff reneged. Plaintiff did not identify any uncertainty regarding the terms of the settlement. Instead, his counsel explained that, while the settlement was being memorialized, they had communicated with a witness they believed would offer strong testimony in their favor that could "bankrupt" the company. (2-ER-247.)

Rash Curtis moved to enforce the settlement agreement. The district court denied the motion without an evidentiary hearing, concluding there had been no meeting of the minds because the email exchange did not explicitly hash out several terms in the written draft—a mutual release of claims, a waiver of California Civil Code § 1542, and an assurance class counsel would not file another similar lawsuit with different representatives. (1-ER-13.) The district court concluded these terms were material, and because they were not resolved over email, the settlement was not complete and enforceable. (*Id.*)

**IV.  The district court certifies the class, requiring as a prerequisite for membership a call to a skip-traced phone number, with Plaintiff as the sole class representative.**

In May 2017, Plaintiff filed a motion for class certification. (2-ER-288.) He sought certification of four subclasses, based on which dialer was used, whether the called party heard an automatic or prerecorded voice, and whether the called party was a non-debtor. (1-ER-16–17.) A prerequisite for membership in each subclass was that the class member *must* have been called at a skip-traced number. (*See id.*) Plaintiff imposed this prerequisite to avoid individualized disputes over whether a particular class member had consented to be called. (*See* 2-ER-296 (arguing that for skip-traced numbers, "the TCPA violations are clear and uniform").)

In certifying the class, the district court ruled that Plaintiff was an appropriate class representative because the discovery to date had not indicated he gave his phone number to one of Rash Curtis's clients, so it was reasonable to infer that Rash Curtis had instead obtained his number through skip tracing. (1-ER-25–26.)[3]

---

[3]  At that time, Rash Curtis presented a facesheet for Daniel Reynoso's account to show that Sutter had permission to call the 5193 phone

**V.  The district court grants Plaintiff partial summary judgment, ruling that Rash Curtis's dialing systems were ATDS's and Plaintiff did not consent to be called.**

The parties filed cross motions for summary judgment. (3-ER-464, 495.) Plaintiff sought summary judgment that Rash Curtis's dialing systems constituted ATDS's under the TCPA, and that Rash Curtis did not have prior express consent to call Plaintiff. (3-ER-465.)

The district court granted Plaintiff's motion. (1-ER-33–34.) It ruled that each of Rash Curtis's dialers was an ATDS as a matter of law, even though the dialers made calls to stored numbers rather than generating random or sequential numbers. (1-ER-37–39.) It also ruled that Rash Curtis did not have prior express consent to call Plaintiff. The court acknowledged that Plaintiff had given his number to Sutter as a care provider when taking patients to the hospital but concluded that Plaintiff did not provide the number in connection with Reynoso's debt. (1-ER-42–43.)

---

number included on the facesheet. (*See* 1-ER-25.) However, because the facesheet was not provided to Rash Curtis by Sutter until *after* the calls were made to Plaintiff, the district court ruled that Rash Curtis had not obtained the number via the facesheet. (*Id.*) The district court did not address whether Rash Curtis had obtained Plaintiff's number from Sutter in some other form. (*See id.*)

12

As to whether Plaintiff's number had been skip-traced by Rash Curtis (a different and narrower inquiry than whether he was called with consent), the district court did not reach that issue on summary judgment. (*See* 1-ER-42–43.)

## VI. Plaintiff attempts to prove that Rash Curtis called skip-traced phone numbers through the opinions of three experts.

Plaintiff's expert Randall Snyder designed a methodology by which Plaintiff's experts purported to determine from Rash Curtis's call logs which phone numbers belonged to the class as defined (i.e., which numbers were skip-traced), and this methodology was then implemented by experts Colin Weir and Anya Verkhovskaya. (*See* 8-ER-1752.) Under Snyder's methodology, the experts analyzed the list of *all* calls to numbers stored in fields 5-10 of Rash Curtis's database to develop the class list. (*See* 8-ER-1752.) Weir reviewed Rash Curtis's call logs and account records and identified all phone numbers in fields 5-10. (6-ER-1307.) He then removed any numbers from that list if they were *also* stored in fields 1-4 (fields reserved for numbers received from creditor-clients and therefore not skip-traced). (6-ER-1307, 12-ER-3094.) Although this methodology assumed that only skip-traced

13

numbers were in fields 5-10, Weir testified at deposition that he made no such determination. (6-ER-1404 ("It was not part of my assignment to determine which calls were skiptraced. It was my assignment to . . . determine which calls were made to phone numbers in fields five through ten.").)

Verkhovskaya then consulted national databases to remove any numbers that were not cell phone numbers. (4-ER-835, 6-ER-1309.) She also removed any numbers that appeared to be related to a debtor, using "fuzzy match" technology to connect debtors to phone numbers even if there was a variation or change in their name. (4-ER-836–37.) This list was then used to tabulate the total number of calls that purportedly violated the TCPA. (6-ER-1311.)

Rash Curtis sought to exclude this expert testimony as unreliable under *Daubert* because the methodology was built on the false premise that each and every number in fields 5-10 was skip-traced, despite the lack of any evidentiary support for that premise. Steven Kizer, a previous employee of Rash Curtis and Plaintiff's only fact witness other than Plaintiff, testified at his deposition (later presented at trial) that the numbers in fields 5-10 were obtained through "a variety of sources."

(7-ER-1548.) Snyder testified that, although the "general procedure at Rash Curtis is to put skiptraced numbers in [fields 5-10]," that "doesn't mean that's the only numbers they can put in there and I'm not testifying to that." (9-ER-2001.)

The district court denied the *Daubert* motions, concluding that this factual inaccuracy went to the weight of the expert conclusions rather than their admissibility. (1-ER-111–14.) The district court did not make any explicit finding that the experts' opinions were reliable. (*See id.*)

## VII. The district court refuses to consider a motion to decertify, even when it becomes clear that Plaintiff cannot demonstrate every class member's phone number, including his own, was skip-traced.

As discovery progressed and more evidence about the source of Plaintiff's phone number became available, Rash Curtis sought leave to move to decertify the class about two months before trial. (9-ER-2262–80.) In the proposed decertification motion, Rash Curtis argued, based on new evidence, both that Plaintiff was not a proper class representative because he was not a member of the class and that the expert methodology used to determine members of the class was unreliable. (9-ER-2264–67.)

15

Rash Curtis showed it was undisputed that Plaintiff was not a member of the class he purported to represent, as his 5193 number was not on Plaintiff's experts' list of skip-traced phone numbers. (10-ER-2291, 11-ER-2639.) Moreover, the evidence showed that Plaintiff's phone number had been stored in field 1. (10-ER-2291, 2526.) Field 1 was the "home" field, (10-ER-2526), reserved for numbers obtained from creditor-clients, not skip-traced numbers. (*See* 12-ER-3094.)

The district court denied leave to file the motion to decertify, refusing to consider any of Rash Curtis's arguments. (1-ER-59.) The court offered no analysis for its decision other than the timing of the motion: "We are going to try this case. This case has been out there for a long time. I'm not granting you leave to file a motion to decertify." (*Id.*)

## VIII. After trial, the jury returns a verdict in favor of Plaintiff and the class.

At trial, the jury was not asked to decide whether Plaintiff's phone number was skip-traced, as required to be a member of the class he purported to represent. (*See* 12-ER-3100.) Instead, the verdict form asked about the dialing system used to call him, the number of times he was called, and the number of calls made using an artificial or prerecorded voice. (12-ER-3100.)

16

For the class members, the jury was asked to determine how many calls were made via skip tracing. (12-ER-3100–02.) The jury found that 534,698 phone calls had been made to the class members. (12-ER-3101–02.) It also found that all but 31,064 of the calls were made with an "artificial or prerecorded voice." (12-ER-3102.) The district court multiplied the number of calls by $500, and entered judgment for $267,349,000. (13-ER-3175–76.)

## IX. The district court denies Rash Curtis's motion to amend the judgment to reduce the unconstitutionally excessive damages award and grants Plaintiff's motion for an award of attorney fees from a common fund.

After trial, Rash Curtis filed a motion to reduce or vacate the damages award as unconstitutionally excessive. (13-ER-3247.) The district court denied the motion, ruling that there was no concrete guiding methodology for reducing a statutory damages award, and that Rash Curtis's proposal for reducing the award (to $1 per call) was not warranted. (*See* 1-ER-138, 140.)

Rash Curtis also opposed class counsel's motion for attorney fees based on a percentage of the judgment, arguing that it was inappropriate to treat the judgment as a common fund because it could shift fees to Rash Curtis. (13-ER-3190–92.) The district court rejected

17

this argument and awarded class counsel 33% of the judgment as attorney fees, to be taken out of the judgment as a common fund, for a total of $89,116,333.33. (1-ER-159.)

## SUMMARY OF ARGUMENT

Plaintiff's case is fundamentally premised on skip tracing. At Plaintiff's request, each subclass required that class members be called at a skip-traced phone number. In choosing this path, Plaintiff sought to avoid proving the individual issue of whether each class member gave prior express consent to be called, as such individualized inquiries typically preclude class certification.

Throughout the litigation, Plaintiff offered expert testimony about Rash Curtis's database to prove which class members were called at skip-traced phone numbers. Crucial to Plaintiff's experts' methodology for identifying and counting calls to skip-traced numbers was an assumption—the factual accuracy of which no evidence supports—that each and every phone number in certain fields in Rash Curtis's database (fields 5-10) was obtained via skip tracing. Plaintiff's experts implemented this flawed and unreliable methodology by taking each phone number in those fields and removing numbers that were

18

duplicates from other fields, not assigned to cell phones, or belonged to a debtor. They then tallied the number of calls to the remaining numbers and presented that to the jury, notwithstanding that the list of numbers forming the basis for their entire analysis included *both* skip-traced and non-skip-traced phone numbers.

Following a one-week trial, the jury returned a verdict for Plaintiff, finding he had been called by Rash Curtis fourteen times using a dialer and/or prerecorded voice. Notably, the jury was *not* asked to find whether Rash Curtis obtained Plaintiff's number through skip tracing, and in fact his phone number was *not* included on Plaintiff's experts' list of skip-traced numbers presented to the jury. The jury also returned a verdict for the class, finding Rash Curtis had made 534,698 calls to numbers obtained via skip tracing—exactly the tally presented by Plaintiff's experts. It also found that those calls either used a dialing system that the court had previously determined to be an ATDS, or an automatic or prerecorded voice when the call connected.

Subsequently, the district court entered statutory damages of $500 per call, for a total judgment exceeding $267 million, an amount that constitutes ruinous liability for Rash Curtis. The court also ruled

that the judgment should be considered a common fund, and awarded class counsel an attorney fee of one-third of the fund.

The judgment imposed a crippling and unconstitutionally large damage award and was infected by prejudicial legal error and abuses of discretion at multiple junctures. It must be reversed with instructions to enter judgment in favor of Rash Curtis for two independent reasons.

First, the district court abused its discretion in allowing Plaintiff's expert witnesses to testify about how many calls to class members were accomplished via skip tracing. The court erred in failing to make an explicit finding that those experts' methodology was reliable under *Daubert*. The methodology was in fact fatally flawed because it was grounded on the false assumption that all numbers found in certain fields of Rash Curtis's database were skip-traced. Reversal with instructions to enter judgment for Rash Curtis is required because absent the improperly admitted expert testimony, Plaintiff had insufficient evidence of Rash Curtis's liability to the class.

Second, reversal is required because the district court abused its discretion by refusing to decertify the class even after it became clear— including through Plaintiff's own expert reports—that Plaintiff was not

a member of the class he purported to represent, because his phone number was not skip-traced. To the extent the district court (wrongly) believed that whether Plaintiff's number had been skip-traced was a disputed factual issue, the court erred in refusing to put that issue to the jury for resolution.

Even assuming the judgment should not be reversed in its entirety, the district court made several *more* errors that necessitate substantial reductions in the amount of the judgment.

First, the district court abused its discretion in denying Rash Curtis's motion to enforce an early settlement agreement in which Plaintiff's counsel—with client authorization—offered to settle the case for $60,000 and Rash Curtis's counsel accepted that offer by stating "we have a deal." The court should have entered judgment in the agreed amount of $60,000 at that juncture, and this Court should reverse the judgment with instructions to enter judgment for the three original individual plaintiffs in this amount.

Second, the district court erred in refusing to reduce the award as unconstitutionally excessive. The court viewed the governing standard

as lacking specificity, but erred by abdicating its responsibility to meaningfully apply the requisite standard.

Third, this Court should reverse with directions to exclude all calls made between 2015 and July 6, 2020, because the TCPA's ban on automatically dialed calls from private parties such as Rash Curtis was unconstitutional during that period. *See AAPC*, 140 S. Ct. at 2356.

Fourth, the district court erred in denying summary judgment to Rash Curtis and ruling that its dialers constitute ATDS's under the TCPA, even though they do not dial randomly or sequentially generated phone numbers. As a matter of law, the dialers were not ATDS's. Accordingly, the judgment should be reduced by $15,532,000, which reflects the number of calls the jury found were made with an ATDS only (and not also a prerecorded or artificial voice).

Finally, the district court abused its discretion in ruling that the damages award is a common fund from which class counsel is entitled to a percentage-based fee. Treating a TCPA class action award as a common fund is erroneous because the liability stems from separate and distinct violations as to each class member, rather than a single violation that injured many people. And if, as is likely, only a fraction of

the class members claim their share of the judgment, and the district court later rules that unclaimed funds should revert to Rash Curtis, this error would have the impermissible effect of shifting attorney fees to Rash Curtis in contravention of the American Rule.

These errors and abuses of discretion forced Rash Curtis to trial after it had already struck an enforceable settlement agreement, against an unreliable and overbroad class, represented by an individual who was not a class member, leading to an unconstitutionally excessive judgment tainted by the potential for impermissible fee-shifting.

This Court should reverse.

# ARGUMENT

**I.    Judgment for the class should be reversed because the district court abused its discretion by determining class membership based on an unreliable methodology that failed to follow the governing class definition.**

**A.    The district court's "gatekeeper" responsibility under *Daubert* required it to make an explicit finding that Plaintiff's experts' methodology for determining class membership was reliable.**

Federal Rule of Evidence 702 governs the admission of expert testimony and requires district courts to act as "gatekeepers" by admitting expert testimony only if it is both reliable and relevant.

*Daubert,* 509 U.S. at 589. A district court's decision about whether to exclude an expert's testimony under *Daubert* is reviewed for abuse of discretion. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1231 (9th Cir. 2017). In the *Daubert* gatekeeping role, courts must actually assess whether the challenged expert opinion is reliable; courts "do not have 'discretion to abandon the gatekeeping function' altogether." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (citation omitted). In determining whether an expert's testimony should have been admitted, this Court is concerned "not [with] the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Although the reliability analysis is flexible and should be tailored to the particular circumstances of the case, the district court must make an explicit reliability finding. In *Ruvalcaba-Garcia*, the district court admitted disputed expert testimony by declaring that "there's a basis for [the expert] to offer an opinion." 923 F.3d at 1190 (citation omitted). On appeal, the proponent of the testimony argued this was a sufficient finding of reliability, which was implicit in its decision to admit it. *Id.* The Ninth Circuit reversed, holding that the district court's ruling "at

24

most 'suggests an *implicit* finding of reliability,' which is not sufficient." *Id.* (emphasis added) (citation omitted). "To satisfy its 'gatekeeping duty' under *Daubert*, the court must 'make an *explicit* reliability finding.'" *Id.* (emphasis added) (citation omitted).

## B. The district court failed to make an explicit finding regarding the reliability of Plaintiff's experts' methodology.

Plaintiff proposed, and the district court certified, a class definition that required members of all four subclasses to be called at skip-traced numbers. (*See* 1-ER-16–17; 2-ER-297.) Plaintiff imposed this prerequisite to avoid individualized disputes over whether each class member had consented to be called, which can be a defense to liability under the TCPA. *See* 47 U.S.C. § 227(b)(1)(A); *see also* 2-ER-296. But Plaintiff's experts were allowed to present a class list to the jury based on a fatally unreliable methodology that failed to exclude individuals not called at skip-traced phone numbers, resulting in untold numbers of such individuals recovering compensation from Rash Curtis without proving they were class members. The district court abused its discretion in denying Rash Curtis's *Daubert* challenge.

The district court failed to meet its gatekeeping duty under *Daubert* to make an explicit finding that Plaintiff's experts' methodology was reliable. Instead, it ruled only that Snyder's testimony was "relevant," Weir's opinions were "within the scope of Rule 702," and false assumptions went to the "weight, not the admissibility" of Verkhovskaya's opinions. (1-ER-113–14.) The district court's "implicit" finding of reliability—to the extent it can even be called that—was an abandonment of the gatekeeping function and an abuse of discretion. *Ruvalcaba-Garcia*, 923 F.3d at 1190 (citation omitted).

### C. The district court's admission of unreliable expert testimony was not harmless, because the methodology was based on the unsupported assumption that each number in fields 5-10 was skip-traced.

Where, as here, the district court fails to explicitly conduct the *Daubert* reliability analysis, the error is presumptively prejudicial. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464-65 (9th Cir. 2014) (en banc), *overruled on other grounds by United States v. Bacon*, No. 18-50120, 2020 WL 6498258, at *4 (9th Cir., Nov. 5, 2020). The presumption can be rebutted only by showing "it is more probable than not that the jury would have reached the same verdict even if the evidence had not been admitted." *Id.* (citation omitted). Moreover,

26

prejudice is "at its apex when the district court erroneously admits evidence that is critical to the proponent's case." *Id.* at 465.

Here, Plaintiff cannot meet his burden of showing the district court's error was harmless. *See Ruvalcaba-Garcia*, 923 F.3d at 1190. Without the experts' testimony, the jury would have lacked any evidence on which to base a finding of how many calls were placed by Rash Curtis to skip-traced phone numbers. Thus, beyond dispute, the jury could not have reached the same verdict without the expert testimony.

Even if the district court had made an explicit, rather than implicit, finding of reliability, that reliability finding would be a prejudicial abuse of discretion. On a *Daubert* motion, the court's task "is to analyze not what the experts say, but the basis they have for saying it." *Wendell*, 858 F.3d at 1232. Expert opinion testimony is reliable, and therefore admissible under Rule 702, only if "the knowledge underlying it has a reliable basis." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). "In determining whether a proffer of [expert] evidence is sufficiently reliable," this Court has held that "[o]ne very significant fact to be considered is whether the experts are proposing to

testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th Cir. 2003) (citation omitted).

Snyder devised his methodology, on which all three of Plaintiff's experts relied, specifically for the purpose of testifying in this litigation. (*See, e.g.,* 8-ER-1747–52.) This Court has cautioned against this type of methodology when it appears to have no support in any research or scientific principle that exists outside of litigation. The methodology was constructed on the unsupported assumption that each of the numbers in fields 5-10 of Rash Curtis's database was skip-traced. Yet no evidence supports that assumption.

In fact, that assumption was false. The *only* available evidence— both at the time of the *Daubert* motions and through trial—was that fields 5-10 contained *both* skip-traced numbers and other numbers obtained from a "variety of sources." (7-ER-1548.) Indeed, Snyder himself refused to assert that *all* numbers in those fields were skip-traced. (9-ER-2001 ("[T]he general procedure at Rash Curtis is to put

28

skiptraced numbers in [fields 5-10]. That doesn't mean that's the only numbers they can put in there and I'm not testifying to that . . . .").) There was no other version of the facts that the jury might have accepted. The unreliable methodology thus inserted into the class an indeterminate—and potentially quite large—number of phone numbers that were not skip-traced.

This foundational problem tainted every other aspect of the experts' methodology, which included the following steps: (a) start with each and every phone number in fields 5-10; (b) remove any phone number that was also found in fields 1-4; (c) remove any non-cell-phone numbers; and (d) remove any phone numbers associated with a debtor. (*See* 6-ER-1307; *see also* 4-ER-834–39.) Because the starting dataset cast an impermissibly broad net, catching skip-traced and non-skip-traced numbers alike, the experts' later analytical steps were irreparably flawed as well. Indeed, Weir acknowledged that he made no contrary determination. (6-ER-1403–04.)

The next three steps did not eliminate non-skip-traced numbers. Those numbers were sometimes placed in fields 5-10 even where they were not *also* inputted into fields 1-4 (such as an "overflow" number

29

from the client that would not fit in fields 1-4). (13-ER-3171–2.) Likewise, whether or not a number was assigned to a cell phone has no logical connection to whether it was skip-traced; that information was necessary for a separate class requirement that calls be made to "cellular telephones." (S*ee* 1-ER-16–17.) And eliminating numbers that had a "fuzzy match" with a debtor's name concerned only the issue of ownership, not skip tracing. Thus, although Weir insisted that this process eliminated non-skip-traced numbers that "might have found their way into phone fields five through ten," (12-ER-3122), the process does not reliably do so.

When an expert's methodology is devised around an unfounded assumption, the methodology is unreliable and the expert's testimony should be excluded. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (excluding expert testimony as unreliable where it "rests on unsupported assumptions and unsound extrapolation"); *see Legg v. Voice Media Grp., Inc.*, No. 13-62044, 2014 WL 1767097, at *3-5 (S.D. Fla. May 2, 2014) (excluding Snyder's testimony in another TCPA case because his methodology "lack[ed] an adequate factual foundation" and,

thus, the class list he created was not "coextensive" with the class as defined by the court).

Plaintiff's experts' testimony should not have been admitted. And because there was no other admissible evidence presented to the jury by which it *could* reach its verdict, judgment as a matter of law is appropriate. *Weisgram v. Marley Co.*, 528 U.S. 440, 446-47 (2000). In the alternative, this Court should remand for a new trial. *Barabin*, 740 F.3d at 467.[4]

---

[4] Under this Court's recent decision in *Bacon*, 2020 WL 6498258, at *4, this panel has discretion whether to order a new trial or remand for the district court to perform an appropriate gatekeeping analysis. In cases such as this one, however, the Court should remand for a new trial because it is clear that a proper *Daubert* analysis could only lead to the exclusion of the expert testimony. As *Bacon* noted, where (as here) the district court improperly *admitted* (rather than excluded) expert testimony, a new trial may be necessary to avoid "undue risk of post-hoc rationalization." *Id.* at *2 (citation omitted).

**II.    Judgment for the class must be reversed because the district court erred in refusing to decertify the class since Plaintiff is not a member of the class and thus not a proper class representative.**

   **A.    The district court had a continuing duty to ensure that the requirements of Federal Rule of Civil Procedure 23 were met throughout the litigation.**

After it certified the class, the district court had a continuing legal duty to ensure that the requirements of Federal Rule of Civil Procedure 23 were met and that Plaintiff was a member of the class he purported to represent. Rule 23 "provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005).

   **B.    It is reversible error to refuse to decertify a class where the class representative is not a member of the class.**

A class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' . . . In order to justify a departure from that rule, a 'class representative *must* be part of the class and "possess the same interest and suffer the same

32

injury" as the class members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citations omitted). "By insisting on a class representative with typical claims, Rule 23 commits itself to a particular concept of representativeness that is not necessarily obvious—namely, that the representative will be a member of the class that she seeks to represent. . . . [T]he typicality requirement demands that a member of the class be the class representative." 1 William B. Rubenstein et al., Newberg on Class Actions § 3:28 (5th ed. 2011).

In analogous circumstances, the Supreme Court has reversed class certification where the class representative's claims were not aligned with those of the class members. In *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 398-400 (1977), individual plaintiffs brought an action on behalf of a class of Black and Mexican-American city truck drivers, alleging that the employer's seniority and transfer policies racially discriminated against otherwise-qualified applicants. The trial proceedings, however, made clear that the named plaintiffs were not otherwise qualified for hire. *Id.* at 403. "In short," the plaintiffs "were not members of the class of discriminatees they purported to represent." *Id.* Because the Court had "repeatedly held"

that "a class representative must be part of the class," the Court held that class certification was error. *Id.* at 403-04.

*East Texas* stands for the bedrock principle that a class representative must belong to the class being represented. If not, it is reversible error to maintain class certification, even if the disconnect between the representative and the class becomes clear after the original certification decision is made.

A few years later, the Supreme Court held that class treatment is improper even if the individual nonmember plaintiff can and does prevail on an individual claim under the same statute. In *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 152 (1982), the court considered a class action brought by Mexican-American applicants and employees alleging racial discrimination in hiring and promotion. Both the individual plaintiff and the class had prevailed on their employment discrimination claims, but under different theories (the individual for promotion practices and the class for hiring practices). The Court held the district court committed reversible error by allowing the case to proceed as a class action because the individual plaintiff did not belong to the class. *Id.*

In *General Telephone*, the Fifth Circuit had held that certification was appropriate because the plaintiff's action was an "'across the board' attack on unequal employment practices alleged to have been committed . . . pursuant to a policy of racial discrimination," so it was immaterial that plaintiff was not a class member because he could represent "class members suffering from different practices motivated by the same policies." *Id.* at 154. The Supreme Court rejected this reasoning, holding that the plaintiff "must prove much more than the validity of his *own* claim," but instead demonstrate that "the class claims are 'fairly encompassed' within his claim." *Id.* at 158-59 (emphasis added) (citation omitted). He could not satisfy this standard because the evidence needed to prove his individual claim for promotion discrimination did not answer a common question "concerning the failure of petitioner to *hire* more Mexican-Americans." *Id.* at 158.

Because of this "wide gap" between the plaintiff's claim and the class claim, "it was error for the District Court to presume that respondent's claim was typical of other claims against petitioner by Mexican-American employees and applicants." *Id.* at 157-59. At bottom, the Supreme Court held that the district court committed an "inherent"

35

error in its "across-the-board" approach and its "failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)." *Id.* at 160.

Furthermore, the Supreme Court emphasized that the district court's obligation to carefully evaluate the legitimacy of the class continues throughout the litigation, and is not extinguished once a court makes an initial class certification ruling. "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation," because certification orders are "inherently tentative." *Id.* Although the class-action device is flexible, "*actual, not presumed* conformance with Rule 23(a) remains, however, indispensable." *Id.* (emphasis added). It was therefore "error for the District Court to presume that respondent's claim was typical of other claims against petitioner" for purposes of Rule 23, where the representative's Title VII claims were different from those raised by the class members. *General Telephone,* 147 U.S. at 158-59.

This Court reached a similar result in *Lierboe v. State Farm Mutual Automobile Insurance Co.*, 350 F.3d 1018 (9th Cir. 2003). The plaintiff there sued on behalf of a purported class of policyholders whose

claims had been denied due to the insurer's refusal to "stack" multiple insurance policies. *Id.* at 1020. After the district court certified the class, however, the Montana Supreme Court in related litigation held that the individual plaintiff had only one policy and thus had no viable "stacking" claim. *Id.* at 1021 (citing *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 73 P.3d 800 (Mont. 2003)).

Once that became clear, this Court vacated the district court's decision certifying the case as a class action: "If Lierboe has no stacking claim, she cannot represent others who may have such a claim, and her bid to serve as class representative must fail. *This principle is dispositive of the appeal of the class certification*." *Id.* at 1022-23 (emphasis added). This Court therefore remanded with instructions to dismiss the case. *Id.* at 1023 (citing *Foster v. Ctr. Twp. of LaPort Cty.*, 798 F.2d 237, 244-45 (7th Cir. 1986)) (holding where plaintiff "never was a member of the class she was named to represent," the case must be remanded with instructions to dismiss (citation omitted)).

**C.**   **The district court erred in granting class certification and later refusing to decertify the class because Plaintiff's phone number was not skip-traced and he is therefore not a member of the class he purportedly represents.**

Certifying and later refusing to decertify the class with only Plaintiff as a class representative was reversible legal error under *East Texas*, *General Telephone*, and *Lierboe*.

The definition of each subclass required a call to a skip-traced phone number as a prerequisite for membership. (*See* 1-ER-16–17.) Plaintiff never sought to prove, and the jury was never asked to determine, whether Plaintiff's phone number was obtained via skip tracing. (12-ER-3099–102.) According to Plaintiff's experts' own methodology, his 5193 phone number was not skip-traced because it does not appear on the experts' list of skip-traced numbers. (12-ER-3110.) This alone is an implicit acknowledgment that Plaintiff cannot prove his phone number was obtained by skip tracing, because the expert list (overbroad as it was) was the only evidence presented about which numbers were skip-traced. Quite simply, Plaintiff is not a member of the class he purports to represent and cannot satisfy the typicality requirement of Rule 23.

The district court at most found that Plaintiff stated an individual TCPA claim, but that is not sufficient. In its initial class certification decision, the district court ruled that Plaintiff did not consent to be called by Rash Curtis because "Perez's provision of his phone number was not in connection with any particular debt owed by Perez." (1-ER-25.) This ruling recognizes that, at most, Plaintiff may have had a viable *individual* TCPA claim. But it does not answer the critical question whether his phone number was skip-traced, as was required for membership of the class he purported to represent. As to that question, the district court made no factual finding that Plaintiff's phone number was obtained by skip tracing. (*See* 1-ER-25–26.) And for good reason: at no time did Plaintiff provide any evidence that Plaintiff's phone number had been obtained via skip tracing—only that it was not obtained from Reynoso's account documents. But as the litigation continued, the developing factual record made it clear that Plaintiff's phone number was *not* obtained via skip tracing.

Crucially, Plaintiff's phone number *does not appear* on Plaintiff's experts' class list. (10-ER-2291; 11-ER-2637–40; 12-ER-3110.) This is because, as reflected in the account notes for Reynoso, the 5193 phone

number (which was assigned to Plaintiff) was deleted from phone field 1, which contains residential numbers obtained from creditor-clients like Sutter. (10-ER-2526; 13-ER-3143.) Because this number was *nowhere* in the database at the time Plaintiff's experts implemented their (overbroad and speculative) methodology, Plaintiff was not on the class list. Further, as Plaintiff's number had been stored in field 1, (*id.*), he could not have qualified as a class member under Plaintiff's experts' methodology, which required removing all phone numbers duplicated in fields 1-4. (6-ER-1307).

Rash Curtis presented this argument to the district court when it sought leave to file a decertification motion. (10-ER-2291.) Rash Curtis relied on evidence not available at the certification stage, including Plaintiff's final expert reports, which were first made available in November 2018 (4-ER-829; 6-ER-1304; 7-ER-1707), six months before trial. But the district court denied leave to file that motion for no reason other than timing. (*See* 1-ER-59.) The court noted that the case had been pending for years and trial was near. (1-ER-59.) The court did not address the merits of Rash Curtis's arguments or the new evidence not available at the certification stage. (*See id.*)

In failing to even consider Rash Curtis's decertification motion, the district court committed the same error identified in *General Telephone*: "the failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)." 457 U.S. at 160. As *General Telephone* held, a district court cannot simply "presume[ ]" that those requirements continue to be met after the initial certification decision; it must instead modify certification as appropriate "in the light of subsequent developments in the litigation." *Id.*

Additionally, the district court here appears to have tacitly embraced the impermissible "across the board" theory that *General Telephone* rejected. In the pretrial conference, Plaintiff's counsel argued that skip tracing was not an element of Plaintiff's *individual* claim. (12-ER-3089.) But this misses the point. Even if Plaintiff's argument is correct, such that he established his own claim for relief, he nonetheless needed to prove his phone number had been skip-traced to qualify as a member of the class and thus to demonstrate the typicality required for class status. Just as the plaintiff who prevailed on his individual claims in *General Telephone* could not represent a class which prevailed on

different claims, the Plaintiff here cannot use his distinct, individual claim to launch an "across the board" challenge to other alleged TCPA violations based on different practices.

And, just as it did in *General Telephone*, the evidence at trial followed a "predictable course" whereby the "evidentiary approaches" for Plaintiff's individual claim and that of the class "were entirely different." 457 U.S. at 159. Plaintiff attempted to substantiate his individual claim by proving that Rash Curtis's call logs showed fourteen calls to his phone number, he heard a recording when he answered those calls, and he did not consent to be called. In contrast, Plaintiff tried to prove the class claims through expert analysis of Rash Curtis's call fields—an analysis that at no point included Plaintiff's phone number. There was no overlap between the two evidentiary approaches; "the individual and class claims might as well have been tried separately." *Id.*

The district court in this case had no discretion to ignore the gap between Plaintiff's individual claim and the class's skip-tracing claim. The court's reasoning for ignoring the decertification motion—that it had previously ruled on a certification motion and trial was near—was

42

legal error. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[T]he Due Process Clause . . . requires that the named plaintiff *at all times* adequately represent the interests of the absent class members." (emphasis added)). Nothing in *General Telephone* suggests that a district court can ignore grounds for decertification merely because they are asserted late in the litigation. Indeed, in that case the district court certified the class in a pretrial order, and then denied subsequent motions to decertify both before *and* after trial. *General Telephone*, 457 U.S. at 152 n.5. The Supreme Court held it was error to maintain the class despite the fact that the decertification requests were made late in the litigation and even after trial.

Thus, decertification of a class is appropriate "*at any time*." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (emphasis added); *accord Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 964 n.7 (9th Cir. 2020) (holding "parties may move a district court to alter or amend an order granting or denying class certification at any time 'before final judgment'" (quoting Fed. R. Civ. P. 23(c)(1)(C)). As *General Telephone* held, this power to modify class certification "in the light of subsequent developments in the litigation" must be

43

exercised in order to ensure "actual, not presumed, conformance with Rule 23(a)" throughout the case. 457 U.S. at 160. The district court must therefore revisit class certification at any time before entry of judgment if developments before or during trial call on it to do so—for example, "if the course of trial on the merits reveals the impropriety of class action maintenance." *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 276 (4th Cir. 1980). "[T]his of course necessarily implies that a reviewing court must be prepared to find error in a trial court's failure to alter or amend to 'decertify' the class action if on the whole record, including the evidence adduced on trial, it appears to the reviewing court that this was the proper course." *Id.* And a district court's decision that is unsupported by any record analysis should not be granted deference. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1116 (9th Cir. 2008) (noting that this Court on appeal "can't defer to reasoning that [it] can't review").

## D. At minimum, the district court erred by not instructing the jury to make the factual determination of whether Plaintiff's phone number was skip-traced.

Whether Plaintiff's phone number was skip-traced and he was therefore a member of the class was an essential prerequisite to

44

allowing the case to proceed to a class action judgment. *See Wal-Mart Stores,* 564 U.S. at 348 (holding a "class representative *must* be part of the class" (emphasis added)). Consequently, Plaintiff had to prove his phone number was skip-traced in order to obtain a judgment for the class. The district court abused its discretion by failing to adopt a special verdict form that asked the jury to determine whether Plaintiff's number was skip-traced and thus was "adequate to obtain a jury determination of the factual issues essential to judgment." *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1991).

The verdict form proposed by the district court, and argued by the parties, included the question "Did Rash Curtis obtain Plaintiff Ignacio Perez's cellular telephone number via skip-tracing and call him on his cellular telephone during the class period with the Global Connect dialer?" (15-ER-3704.) Rash Curtis argued that this question should be included on the verdict form because, in order for the case to continue to proceed as a class action, the factfinder must determine whether or not Plaintiff was a member of the class. (12-ER-3080 (arguing that "the skip-tracing issue, . . . given the court's rulings on Mr. Perez and his individual claim[s], is really going to be the biggest factual issue of the

trial. That is, is there a connection between Mr. Perez and the class? And is he a proper representative of a skip-traced class.").) Plaintiff disagreed, insisting this question had already been resolved at class certification. (12-ER-3083.) But the district court correctly pointed out that the issue had not been resolved and that the only matters decided at summary judgment were that Plaintiff did not give prior express consent and he was called via an ATDS, *not* that his number (or any number) had been skip-traced. (1-ER-42–43, 12-ER-3083–84.)

Nevertheless, the district court decided not to include this question on the verdict form (*see* 12-ER-3099–102), apparently on the basis that his individual claim did not require it. In the jury instruction conference, the district court and Plaintiff's counsel had the following discussion:

> [THE COURT:] So it is, I think, a threshold question to know whether the jury buys your presentation of the evidence and agrees with you that the calls were made to cell phones obtained by – through skip tracing.
>
>  . . . .
>
> MR. BURSOR: I agree with that. But, your honor – well, I agree with that with respect to the class claim, but not with respect to Mr. Perez's claim.

> THE COURT: No, of course not. That's what we
> are talking about. He's easy. We are talking
> about the class claim.

(12-ER-3086.) In this discussion, the district court committed a legal

error in presuming that Plaintiff did not need to make the same

evidentiary showing that the class did—that his phone number was

skip-traced.

The district court appears to have presumed that the question

whether this case could proceed as a class action was: *first*, trapped in

the amber of the factual record developed at the time the class was

certified, rather than the more developed record at trial; and *second*,

independent of factual findings to be made by the jury. (*See* 12-ER-

3083.) Although the issue whether Plaintiff is a proper class

representative under Rule 23 is a legal question reserved for judicial

determination, whether his number *as a matter of historical fact was

skip-traced* is a factual issue that must be answered in the affirmative

for his claim to be typical of the class, and thus for Rule 23 to be

satisfied. That factual question was never resolved because it was not

raised in a motion for summary judgment, and the district court (a) did

not resolve it at the time the court initially certified the case for class

treatment and (b) later denied Rash Curtis's request to put it to the jury for resolution. This was error because Plaintiff failed to secure a jury determination on a disputed fact that was essential to the class action judgment, *see Mateyko*, 924 F.2d at 827, i.e., that Plaintiff was a member of the class he purported to represent.

As the only purported class representative "never was a member of the class [he] was named to represent," or at minimum there was no factual determination on that issue, the case "must be remanded with instructions to dismiss." *Lierboe*, 350 F.3d at 1023.

**III. Even if this Court does not reverse the judgment in its entirety, it should at minimum substantially reduce the award due to multiple errors affecting the amount of the judgment.**

**A. The district court abused its discretion in refusing to enforce the settlement agreement between the parties.**

The district court abused its discretion in refusing to enforce an early settlement agreement between the parties or, at minimum, failing to hold an evidentiary hearing on the issue. This is an independent basis for reversing the judgment with directions to enter a judgment of $60,000 for the original three plaintiffs.

A district court's order on a motion to enforce a settlement agreement is reviewed for abuse of discretion. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). A district court "has the equitable power to enforce summarily an agreement to settle a case pending before it," but it "may enforce only *complete* settlement agreements." *Id.* "The interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993).

A settlement agreement is complete when the parties agree "on all its material terms." *Levitz v. The Warlocks*, 148 Cal. App. 4th 531, 535 (2007). Further, the parties "must have either agreed to the terms of the settlement or authorized their respective counsel to settle the dispute." *McCovey v. Pac. Lumber Co.*, No. C-91-1411-DLJ, 1992 WL 228888, at *3 (N.D. Cal. May 29, 1992) (citing *Harrop v. W. Airlines, Inc.*, 550 F.2d 1143, 1144-45 (9th Cir. 1977) (per curiam)).

"Where material facts concerning the *existence* or *terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie*, 829 F.2d at 890 (reversing and remanding where district court did not hold an evidentiary hearing).

49

Here, the material terms—the amount of the settlement and a payment schedule—were decided between the parties, as evidenced by the email correspondence. (2-ER-215–47.) They also agreed that the settlement would lead to a dismissal with prejudice of the named plaintiffs' claims and dismissal without prejudice of the putative class's claims. (2-ER-217.)

Despite this clear showing that the parties agreed to a complete settlement with clear terms, the district court declined to enforce the settlement or to hold an evidentiary hearing. (1-ER-13.) Instead, the court ruled that the settlement agreement was not complete because three terms the court deemed material had not been resolved: a mutual release of claims, waiver of California Civil Code section 1542, and an assurance that class counsel wouldn't file another similar lawsuit. (*Id.*) It also ruled that under California Code of Civil Procedure section 664.6, an out-of-court settlement agreement must be signed by the parties themselves to warrant summary enforcement. (1-ER-14.) The district court abused its discretion in determining that these were material terms without an evidentiary hearing.

*First*, although the release of claims was not described as "mutual" in the email correspondence, Plaintiff did agree to release his claims with prejudice (and the class's claims without prejudice) in exchange for a payment plan for a certain amount of money. (*See* 2-ER-215–35.) In this context, where Rash Curtis had not alleged counterclaims against Plaintiff,[5] it was an abuse of discretion for the district court to assume, without evidence, that the parties considered it material to have Rash Curtis release *unpled* claims.

*Second*, California Civil Code section 1542 provides that a general release of claims does not extend to future claims that the releasing party "does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." A party can release unknown claims only if it expressly and consciously waives this section. *Kaufman & Broad-South Bay v. Unisys*

---

[5]  Further, the time in which Rash Curtis might have been able to allege counterclaims had already passed. Under Federal Rule of Civil Procedure 13(a)(1), a party is required to include in its responsive pleading "any claim that—at the time of its service—the pleader had against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."

*Corp.*, 822 F. Supp. 1468, 1474-75 (N.D. Cal. 1993). In the first email between the parties during the negotiation, defense counsel offered $30,000 and "request[ed] a release of all known and unknown claims including a Civil Code [section] 1542 waiver." (2-ER-215.) The parties then went back and forth on the monetary amount, settling at a deal of $60,000, without circling back to the section 1542 waiver. There was no evidence in the email record that Rash Curtis considered that term material, in that it would not have struck a deal without it; indeed, the fact that defense counsel said "we have a deal" in response to an offer of $60,000 with a payment plan without resuscitating the request indicates that it was *not* material to Rash Curtis. At the very least, it was an abuse of discretion for the district court to assume, without a hearing, that Rash Curtis would not have finalized the deal without that provision. And neither the district court nor Plaintiff cited any case for the proposition that such a term is material as a matter of law. (*See* 1-ER-13; 2-ER-262–63.)

*Third*, for the same reason, although Rash Curtis would have preferred that class counsel commit to not filing another lawsuit, the evidentiary record indicates the parties did not consider this to be a

material term since they nonetheless agreed to a settlement—including the dismissal of the putative class's claims without prejudice—without this term. And, again, at the very least it was an abuse of discretion for the district court to assume, without an evidentiary hearing, that Rash Curtis would not have finalized the deal without that provision.

*Fourth*, with respect to California Code of Civil Procedure section 664.6, the district court erred in concluding it could enforce a settlement with respect to the state-law claims only if the parties signed the agreement. Section 664.6 authorizes an "expedited enforcement procedure" for settlement agreements that have been signed by the parties. *Gauss v. GAF Corp.*, 103 Cal. App. 4th 1110, 1113 (2002). But the availability of this summary procedure does not make it the exclusive means to enforce a settlement. *See id.* at 1122. If an otherwise enforceable settlement agreement is not signed by the parties themselves, they can still enforce the settlement by other procedural means, for example "by motion for summary judgment, by a separate suit in equity or by amendment of the pleadings to raise the settlement as an affirmative defense." *Id.* And as this Court noted in *Callie*, federal district courts have the inherent "equitable power to enforce summarily

an agreement to settle a case pending before it." 829 F.2d at 890. Whatever limits section 664.6 places on state courts in similar circumstances are thus irrelevant here.

After entry of judgment, the parties entered into a stipulation that highlights the district's court's error in denying the motion to enforce the settlement. The parties stipulated that on "December 19, 2016, Perez's counsel made an *offer in writing to settle the Lawsuit for $60,000.*" (14-ER-3504 (emphasis added).) The stipulation demonstrates that the additional terms identified by the court were immaterial to Plaintiff, who now agrees that he made a binding offer despite those issues not being discussed. "Under California law . . . , a binding offer 'is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to his bargain is invited and *will conclude it.*'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1205 (9th Cir. 2010) (citation omitted). Because the parties stipulated to the terms of the offer, and there is no dispute that Rash Curtis assented to the offer (as explicitly invited by Plaintiff's counsel), Rash Curtis is entitled to enforcement of the settlement terms. The stipulation identifies those terms—payment of $60,000 in exchange for

dismissal with prejudice of Plaintiff's claims and dismissal without prejudice of the class's claims.

Finally, although Plaintiff's counsel opposed the motion to enforce the settlement on the further ground that they purportedly had no authorization to bind their client, the stipulation also answers that argument. Plaintiff stipulated that this was an authorized offer. (14-ER-3504.)[6] Factual stipulations are "binding and conclusive." *Christian Legal Soc. Chapter of the Univ. of Calif., Hastings College of the Law v. Martinez*, 561 U.S. 661, 677 (2010).

At minimum, the district court should have held an evidentiary hearing before determining that the terms it identified as missing were material, or that Plaintiff's counsel had not been authorized to settle the case, given that those factual issues were disputed by the parties.

---

[6]   This admission was made in the recitals to a posttrial agreement in which Rash Curtis assigned to Plaintiff its bad faith cause of action against its insurer. (14-ER-3504.)

**B.** **The district court erred in not meaningfully applying the legal standard for reducing a judgment due to unconstitutionally excessive damages.**

The district court erred in denying Rash Curtis's posttrial motion to reduce the damages award as unconstitutionally excessive by abdicating its responsibility to apply the governing legal standard. Thus, if this Court does not vacate the judgment in its entirety or reduce it to the amount of the settlement agreement, it should reverse the judgment with directions to reduce it to $1 per call, or the maximum amount of damages constitutionally allowed. Whether a statutory damages award is unconstitutional presents a purely legal question subject to de novo review. *Golan v. FreeEats.com, Inc.* (*Golan II*), 930 F.3d 950, 962 & n.12 (8th Cir. 2019).

The TCPA's statutory damages provision is unconstitutional as applied to the class's aggregated award of statutory damages. While Congress has broad discretion to provide for statutory damages, a statutory damages award must satisfy the Constitution. *Golan II*, 930 F.3d at 962. Such an award violates the Due Process Clause if it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251

U.S. 63, 67 (1919). These due process concerns are heightened where, as here, statutory damages "are awarded as a matter of strict liability." *Parker v. Time Warner Ent. Co.*, 331 F.3d 13, 22 (2d Cir. 2003). The "TCPA is essentially a strict liability statute." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011).

The *St. Louis* standard applies to statutory damages awards under the TCPA. *See Golan II*, 930 F.3d at 962; *see also Perez-Farias v. Global Horizons, Inc.*, 499 F. App'x 735, 737-38 (9th Cir. 2012) (applying *St. Louis*'s standard to statutory damages award of "$500 per plaintiff per violation"); *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (9th Cir. 2012) (applying the *St. Louis* standard to "damages awarded pursuant to a statute"). This standard for measuring the constitutionality of statutory damages parallels the rule that due process forbids excessive punitive damages. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

Where a statutory damages award is so high that it imposes ruinous liability, courts assess whether such an award violates constitutional due process by balancing the severity of a defendant's conduct, the need for deterrence, and the plaintiff's intangible losses

such as any invasion of privacy, unwanted disruption, and wasted time. *See Golan v. Veritas Ent., LLC* (*Golan I*), No. 4:14CV00069, 2017 WL 3923162, at \*4 (E.D. Mo. Sept. 7, 2017), *aff'd, Golan II*, 930 F.3d at 962; *accord Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 670 F. Supp. 1133, 1140 (E.D.N.Y. 1987) (noting statutory damages should bear a relationship to plaintiffs' actual damages). Courts also consider an award's financial impact on the defendant. *Legge v. Nextel Commc'ns, Inc.*, No. CV 02-8676, 2004 WL 5235587, at \*15 (C.D. Cal. Jun. 25, 2004). As this Court has observed, "there is something 'jar[ring]' to one's 'constitutional sensibilities' about a court sanctioning any sort of punishment in a civil case when that punishment vastly exceeds the harm done by the party being punished." *In re Late Fee & Over-Limit Fee Litig.*, 741 F.3d 1022, 1030 (9th Cir. 2014) (citation omitted).

Here, these factors require a substantial reduction of the damages award. No actual damages were asserted on behalf of the class, but Rash Curtis is nevertheless liable for a staggering judgment of more than $267 million. This award is 9,500 times greater than Rash Curtis's 2017 net income of $28,879 and dwarfs its ability to pay. (13-ER-3261, 3274–78.) Further, the enormity of the award is not illusory; Plaintiff

has insisted on a judgment against Rash Curtis in the full statutory amount and is currently pursuing enforcement against Rash Curtis's insurer, under an assignment of its bad faith cause of action. 14-ER-3491–678; *Perez v. Indian Harbor Ins. Co.*, No. 4:19-cv-07288, 2020 WL 2322996 (N.D. Cal. May 11, 2020). The award is an order of magnitude larger than the reduced TCPA award in *Golan II*, which affirmed a reduction from $500 per call ($1.6 billion total) to $10 per call ($32 million total). *Golan II*, 930 F.3d at 955. Given the substantial disparity between the award and Rash Curtis's total value as a company, a judgment of this size is vastly disproportionate to the amount that would be required to deter Rash Curtis in the future, and does nothing to compensate class members because they sustained no actual damages. (*See* 13-ER-3261, 3278.) And the blameworthiness of Rash Curtis was minimal, given that its TCPA violations were not willful and it believed its policies complied with the statute. (*Id.*)

The district court refused to analyze the relevant factors; instead, it simply declined to reduce the statutory damages award because it believed the *St. Louis* standard to be too difficult to apply. (*See* 1-ER-136 ("Rash Curtis does not identify any—and the Court can find none—

Ninth Circuit authority on how a district court should reduce damages that are found to be unconstitutionally excessive.").) But just because courts have not yet articulated a mathematical formula or other concrete *method* of reducing excessive statutory damages does not mean that the district court was free to not apply the *St. Louis* standard. Other courts repeatedly have applied that standard. *See, e.g.*, *Golan II*, 930 F.3d at 962; *Perez-Farias*, 499 F. App'x at 737-38; *Capitol Records, Inc.*, 692 F.3d at 907. The district court impermissibly abdicated its responsibility to apply the *St. Louis* standard, explaining it could not identify specific guidelines for precisely *how* to reduce the judgment. (1-ER-140 (characterizing the constitutional standard as "devoid of objectivity").) While the standard may be *difficult* to apply, the district court was still bound to apply it. *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1164 (9th Cir. 2020) (holding "[t]he district court abuses its discretion if it identifies an incorrect legal standard," or "applies the correct standard 'illogically [or] implausibly'" (citation omitted)).

The district court made three further points as to why it was not reducing the award. But none of those points justified the district court's refusal to reduce the statutory damages award here.

*First*, the court found that Congress had a rational basis in enacting the TCPA to combat invasions of privacy in communications. (1-ER-138.) While this may be true, the point of *St. Louis* is to create a constitutional ceiling for excessive judgments that are disproportionate to the offense and unreasonable, *even when* they flow from facially rational statutes and statutory damages schemes. *See Golan II,* 930 F.3d at 962–63 (affirming a reduction in TCPA statutory damages award).

*Second*, the district court noted other, out-of-circuit district court opinions had rejected arguments about constitutional excessiveness in TCPA cases. (1-ER-139.) However, it is unremarkable that the specific facts of particular cases may not have warranted a reduction; that rationale does not shed light on whether the award in *this* case is constitutional. *See Golan II*, 930 F.3d at 954-55, 962 (finding $500 per violation unconstitutionally excessive where defendant plausibly believed it was not violating the TCPA, plaintiffs had given consent to be called on similar topics, the campaign only lasted a week, and the $1.6 billion judgment was "shockingly large").

61

*Third*, the district court found that TCPA class action judgments in other cases have also been large, and "on a total absolute numerical amount, the TCPA award in this matter is not the highest imposed by a district court in this circuit last year." (1-ER-139 (citing *Wakefield v. ViSalus, Inc.*, No. 3:15-cv-01857, 2019 WL 2578082, at *1 (D. Or. June 24, 2019) (awarding statutory damages of $925 million)).)[7] But of course, the *St. Louis* standard requires courts to assess the excessiveness of an award in the fact-specific context of a particular case, by weighing it against actual damages, willfulness, and the defendant's ability to pay. It is not the law that an award must set a numerical record in order for the constitutional analysis to apply.

The district court's failure to meaningfully apply the *St. Louis* standard was prejudicial. If the district court had actually addressed the shocking disproportion between the damages award and Rash Curtis's ability to pay, grappled with the fact that a significantly lower

---

[7]   The Oregon district court in *Wakefield* ruled on a similar posttrial motion, challenging the award as unconstitutionally excessive, after the trial here. *Wakefield*, 2020 WL 4728878, at *1. In doing so, the *Wakefield* court cited repeatedly to the district court's decision in *this* case. *See id.* at *4. These circular cross-references only reinforce the absence of any binding precedent in this circuit to support the district court's ruling here.

award would provide ample deterrence, and recognized that the calls here caused no monetary harm and minimal interruption to class members, it would have reduced the judgment. This Court should reverse the district court's refusal to do so, and either remand for reduction of the damages award to a constitutionally permissible level or remit the judgment to $1 per call, for the same reasons presented to the district court. *See* 13-ER-3247–68; *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1037 (9th Cir. 2020) (holding where damages award "exceeds the constitutional maximum, we decide on a case-by-case basis whether to remand . . . or simply to order a remittitur").

Remittitur to $1 per call is appropriate because Rash Curtis did not willfully violate the TCPA, the harm of an unsolicited phone call (while momentarily disruptive) did not lead to any lasting or monetary harm to class members, and an award of $534,698 would be more than sufficient to deter further violations for a small company such as Rash Curtis. (*See* 13-ER-3277 (stating Rash Curtis's net income for 2017 was $28,879).) This amount is consistent with damages reductions in other TCPA cases where the district courts properly applied the legal standard for excessiveness. *See, e.g., Golan II*, 930 F.3d at 954 (reducing

the award to $10 per violation); *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 466 (D. Md. 2012) (reducing the award to $9 per violation, even with a finding of willfulness); *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 901 (W.D. Tex. 2001) (reducing the award to 7 cents per violation where the defendant was a small company).

**C.** **The judgment should be reduced by the damages attributable to calls made by Rash Curtis from 2015 through the entry of judgment because the TCPA's autodialer ban was unconstitutional during that period and courts do not have jurisdiction to enforce unconstitutional statutes.**

In 2015, Congress amended the TCPA's ban on autodialed calls, carving out an exemption for calls made to collect a debt owed to or guaranteed by the federal government. *AAPC*, 140 S. Ct. at 2343. In *AAPC*, the Supreme Court held that this "unconstitutionally favors debt-collection speech over political and other speech," and severed the exception from the remainder of the statute. *Id.* Consequently, the entirety of the autodialer ban "was unconstitutional from the moment Congress enacted the offending government-debt exception to the moment the [Supreme] Court severed that exception [in July 2020] to preserve the rest of the law in *AAPC*." *Creasy v. Charter Commc'ns, Inc.*, No. 20-1199, 2020 WL 5761117, at *1 (E.D. La. Sept. 28, 2020); *see*

also *Lindenbaum v. Realgy, LLC*, No. 19-CV-2862, 2020 WL 6361915,

at *3-7 (N.D. Ohio Oct. 29, 2020) (citing *Seila Law LLC v. Consumer*

*Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020)).

Federal courts have no jurisdiction to enforce violations of an

unconstitutional law, so non-government callers who allegedly violated

the TCPA during the time it contained the government-debt exception

cannot be held liable for those calls. *Creasy,* 2020 WL 5761117, at *1;

*Lindenbaum*, 2020 WL 6361915, at *7. Since lack of subject-matter

jurisdiction can be raised for the first time on appeal, *MTB Enterprises,*

*Inc. v. ADC Venture 2011-2, LLC*, 780 F.3d 1256, 1258 (9th Cir. 2015),

this Court should hold that the judgment cannot stand because it

awards damages for calls made after Congress enacted the

unconstitutional government-debt exception in 2015 through the entry

of judgment in this case (which predates the Supreme Court's severance

of the exception in *AAPC*).[8] A remand is necessary for a new trial that

---

[8]   Even if this constitutional infirmity did not go to subject-matter
jurisdiction, this Court should reach the issue raised for the first time
on appeal and vacate the judgment, because it is a pure question of law
and the record is sufficient to review the issue. *Cmty. House, Inc. v. City*
*of Boise*, 623 F.3d 945, 968 (9th Cir. 2010). It would be especially
appropriate for this Court to consider the issue because it arises due to

limits liability to the far fewer pre-2015 calls. At minimum, the

judgment should be vacated to permit findings necessary to ascertain

the amount by which the judgment must be reduced.

Although this Court also held that the government-debt exception

should be severed in *Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1156-57

(9th Cir. 2019), *cert. granted*, No. 19-511, 2020 WL 3865252 (July 9,

2020), *Duguid* did not consider or address whether courts retain

jurisdiction to enforce the autodialer ban for calls during the period of

unconstitutionality. Cases are not authority for propositions not

considered or addressed. *See Thompson v. Frank*, 599 F.3d 1088, 1090

n.1 (9th Cir. 2010). And even had *Duguid* answered this question (it did

not), Rash Curtis raises the issue to preserve it for en banc or Supreme

Court review.

---

the Supreme Court's intervening decision in *AAPC. See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1063-64 (9th Cir. 1996).

**D.** **The judgment should be reduced by the damages attributable to the 31,064 calls the jury found were not made with an "artificial or prerecorded voice," because the district court erred in ruling that Rash Curtis's dialing systems were ATDS's.**

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Under the plain language of this statute, a dialer qualifies as an ATDS only if it actually generates the numbers it calls, either randomly or sequentially.

It is undisputed that Rash Curtis's dialers called numbers stored in a database that were not generated by the dialers themselves. (3-ER-470.) Indeed, the theory of Plaintiff's case is that Rash Curtis obtained numbers using skip tracing, not a random number generator.[9] In nonetheless ruling that each of Rash Curtis's dialers qualified as an ATDS, the district court read the phrase "random or sequential number generator" out of the statute in violation of cardinal principles of statutory construction. *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A

---

[9] Plaintiff principally argued that it was legally irrelevant whether the numbers called were randomly or sequentially generated. (3-ER-470.)

statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)).

The district court's ruling here followed Ninth Circuit precedent that is binding on this panel as law of the circuit. *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018). However, there is currently a circuit split as to whether a dialer must produce random or sequential numbers to be an ATDS. The Supreme Court is poised to decide this issue in a pending case, *Facebook, Inc. v. Duguid*, No. 19-511, 2020 WL 3865252 (July 9, 2020), and thus will likely resolve the circuit split prior to the resolution of this appeal. Rash Curtis raises this argument here to preserve it for further review, pending the Supreme Court's opinion in *Duguid*. If the Supreme Court overrules *Marks*, the judgment here will have to be reduced by at least $15,532,000—the damages attributable to the 31,064 calls made by Rash Curtis's dialers that the jury found did not use an artificial or prerecorded voice.[10]

---

[10] The jury made an alternative finding that the remaining calls were made using an artificial or prerecorded voice, relating to a different

**E.  The district court erred in awarding attorney fees to class counsel out of a common fund, thus risking the shifting of fees to Rash Curtis.**

The district court awarded class counsel an attorney fee of one-third of the judgment, totaling more than $89 million. (14-ER-3681.) This fee award was premised on a determination that the judgment was a "common fund," and therefore class counsel could be awarded a percentage of that total amount. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("[T]he district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method.").

However, as the Seventh Circuit has held, it is inappropriate in a TCPA class action to create a common fund and award a percentage-based attorney fee from that fund because TCPA claims stem from "discrete injuries suffered by each recipient of the [calls]," rather than "aggregate and undifferentiated injuries." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 688 (7th Cir. 2013); *cf. Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (affirming

---

basis for TCPA liability that is not affected by the ATDS provision. *See* 47 U.S.C. § 227(b)(1)(A).

percentage-based attorney fee from common fund under farm labor statute, where defendant's conduct simultaneously caused undifferentiated injuries to class members).

Furthermore, treating this judgment as a common fund, with the attorney fee awarded as a percentage of the fund, impermissibly threatens to shift attorney fees to the defendant, even though the TCPA is not a fee-shifting statute. As the Seventh Circuit explained, in the event not all class members claim their award during the claims administration process and the district court orders the unclaimed funds to revert back to the defendant, the percentage-of-the-fund method for calculating the fee award forces the defendant to shoulder the burden of paying class counsel's fees, contrary to the TCPA. *Holtzman v. Turza*, 828 F.3d 606, 608-09 (7th Cir. 2016) ("The district judge held that Turza gets the [unclaimed] money back, and awarding counsel $167 per fax when the class member gets nothing would be equivalent to treating the Act as a fee-shifting statute and requiring Turza to pay the class's attorneys just because he lost the suit."). Like in *Holtzman*, of the $500 in statutory damages for each call here, counsel might eventually be entitled to at most "about $167," or one-

70

third of the damages for each call. *Id.* at 608. But at the distribution stage, it is likely that "a given recipient cannot be located, or spurns the money." *Id.* If that occurs, "counsel are not entitled to be paid for that [phone call]." *Id.* If the district court here eventually permits reversion of unclaimed funds to the defendant at the distribution stage (which it has not yet ruled on), awarding a lump-sum attorney fee measured as a percentage of the *total* common fund would improperly mean that it is *Rash Curtis* who pays the legal fees for the unclaimed calls, rather than the class member who benefited from the representation. *Id.* at 608-09.

Because the judgment reflects discrete statutory violations lumped together, rather than undifferentiated injuries from a single act, it was error for the district court to award a percentage-based attorney fee from a common fund. This Court should reverse that award, as it risks shifting attorney fees from class members to Rash Curtis in contravention of the American Rule.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

November 25, 2020

**HORVITZ & LEVY LLP**
  ROBERT H. WRIGHT
  FELIX SHAFIR
  REBECCA G. POWELL
**ELLIS LAW GROUP, LLP**
  MARK E. ELLIS
  ANTHONY J. VALENTI
  LAWRENCE K. IGLESIAS

By: _____ s/ Rebecca G. Powell _____

Attorneys for Defendant-Appellant
**RASH CURTIS & ASSOCIATES**

## STATEMENT OF RELATED CASES

Rash Curtis & Associates is unaware of any related appeal that fits within the meaning of 9th Cir. R. 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-15946

I am the attorney or self-represented party.

**This brief contains** | 13,979 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Rebecca G. Powell | **Date** | Nov 25, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 08**

74

*Rev. 12/01/2018*